State vs. Hart.

---

No. 10,898.

STATE OF LOUISIANA VS. M. J. HART.

It is the settled jurisprudence of this court that the series of consolidated bonds of this [State known as Agricultural and Mechanical College and Seminary bonds are illegal and void, having been declared null by the Constitution of 1879; and this nullity may be reached and declared in the hands of any third holder, however innocent in their acquisition.

2. That any one who shall collect from the State interest on coupons clipped from said bonds, after he has become advised of the illegality of such bonds, is under obligation to make restitution to the State of the amounts thus paid by the State in error.

3. In case the State Treasurer, having official custody and possession of said illegal bonds, shall fraudulently and feloniously convert same to his own use, and embezzle same, and collect unduly the interest thereon, any one aiding, assisting and conspiring with said treasurer in so doing becomes liable to the State for the amount of interest thus illegally obtained.

4. In case such treasurer shall pledge such illegal bonds for a loan of money, and the pledgee shall, after obtaining knowledge of their illegality, repledge them again to other persons, this state of facts constitutes no defence to the State's demand for possession of the bonds.

5. It is within the power of the court, under such a state of facts, to reach and declare the nullity of the bonds, and decree the right of the State to have same surrendered to her.

APPEAL from the Civil District Court, Parish of Orleans. *King, J.*

*M. J. Cunningham,* Attorney General, and *Walter H. Rogers* for Plaintiff and Appellee:

The State is not responsible for bonds fraudulently issued and put into circulation.

The defendant having received into his possession the trust funds of the State, when he had no right or claim to them, and covered them into his own funds and returned them to the despoiler, must restore the same—a like condition results when he so receives the State funds and applies them to his personal use.

*Farrar, Jonas & Kruttschnitt* for Defendant and Appellant:

1. The State is not entitled to judgment for the surrender of the bonds claimed by her herein:

(*a*) Because she has not prayed for that relief.

(*b*) Because defendant acquired them *bona fide,* for value, and before maturity.

(*c*) Because the State should not be allowed to invoke judicial process to wrest from the hands of her apparent creditor the sole evidence of the latter's claim against her. State vs. Gaines, decided by this Honorable Court, but pending on an application for a rehearing.

The State is not entitled to recover the amounts alleged to have been collected by Hart from her for invalid coupons:

(*a*) Because if defendant had collected the coupons, he would not be liable to return their amount. Cooke vs. the United States, 91 U. S. 404; State vs. Wells, Fargo & Co., 15 Cal. 336.

(*b*) Because defendant did not collect the amount of any invalid coupons.

3.  The State is not entitled to recover from the defendant the amount of checks purporting to be in payment of coupons, and alleged to have been issued by the Treasurer without consideration:

    (*a*) Because it is not shown that they were issued without consideration, or that they were not issued in payment for coupons.

    (*b*) Because it is not shown—as to most of the checks—that Hart ever had any · thing to do with them.

4.  Where a firm business is conducted in the name of one of the partners, his signature to a note or contract, or any other act done by him or in his name, is *prima facie* what it purports to be, his personal act. In other words, the name presumptively represents the person, and not the firm. Bates on Partnership, Sec. 440, and authorities there cited.

The opinion of the court was delivered by

WATKINS, J.   In this suit three distinct claims are made against the defendant in behalf of the State as plaintiff, to-wit:

1. For ($30,760) thirty thousand seven hundred and sixty dollars, amount of certain checks issued by E. A. Burke, Treasurer, purporting to have been in payment of interest coupons on consolidated bonds that were in fact never surrendered, or, in other words, checks issued without any consideration, and payable to the defendant's order.

2. For ($24,300) twenty-four thousand three hundred dollars, as the amount of interest alleged to have been collected by the defendant, or through his procurement, on State bonds alleged to be void.

3. For the surrender and delivery of certain bonds that are alleged to be illegal and void, and unlawfully in the defendant's possession— that is to say, bonds bearing the numbers 728, 735, 755, 766, 775, 782, 814, 818, 829, 882, 897 and 890 of the denomination of $1000 each and aggreating $12,000 in amount, and the bonds bearing the numbers 1902, 1919, 1920, 1821, 1939, 1978, 1984, 2003, 2005, 2007, 2009, 1954, 1937, 2014, 1933, 1967, 1923, 1948, 1918, 1932, 1947, 2041, 2061, 2052, 2040, 2042, 2043, 1928, 1915, 1972, 1873, 1979, 2022, 1955, 1985, 2033, 1945, 1968, 2064, 1930 and 1935 of the denomination of $500 each, aggregating $20,500 in amount.

The prayer of the petition substantially conforms to its averments, though it does not contain any alternate demand for the value of the bonds as a *quantum meruit*, nor any request that judgment condemn the defendant to surrender same—though it is concluded with a demand for general relief.

State vs. Hart.

The cause was tried by a jury, and a general verdict was rendered in favor of the State for the sum of fifty-five thousand and sixty dollars ($55,060) without interest, sustaining the writ of sequestration and commanding the defendant to surrender and deliver up all of the bonds claimed; but the judgment rendered commanded him to deliver certain specified bonds—that is to say, all of the $1000 bonds claimed in the petition, except bonds numbered 766 and 775, and further except bonds of the denomination of $500, numbered 2007, 2009, 2052, 2042, 1915 and 2033. And the judgment further decrees the delivery of bonds numbered respectively 1955, 2023, 2027, 2029, 2058 and 1942 of the denomination of $500 each, which are not claimed in the suit at all.

From that judgment the defendant has appealed.

The theory upon which the Attorney General proposes to hold the defendant is, as we gather from his petition, substantially as follows, viz.:

That under the provisions of the Constitution of 1879, which effected a settlement of the public debt, certain bonds, which had been issued to the Agricultural and Mechanical College and to the Louisiana State University or Seminary Fund under the act of 1874, were declared null and void, and ordered destroyed. That the sums due said institutions were recognized as a debt of the State, and ordered to be placed to the credit of said college and seminary of learning on the books of the State Auditor, and interest thereon paid out of the current school fund. That the aforesaid bonds were held by the State, through the Treasurer, in trust, and were in the possession of the Treasurer in 1879 and 1880 and up to April, 1888, as is evidenced by the official report he made to the Governor, and which was transmitted by him to the General Assembly in January, 1880, and which report was, by the General Assembly, printed and became a public document under the law, and contained a full and complete description of said college and seminary bonds—setting out their numbers and amounts. That the Agricultural and Mechanical College bonds were of the denomination of $1000 each, issued in pursuance of the funding act, it being Act No. 3 of 1874, and bore the numbers 710 to 905 inclusive, and aggregate in amount $196,300—including two small bonds for $100 each; and that the university or seminary bonds were of the denomination of $500 each, likewise issued under the funding act of 1874, and bore the numbers 1902 to 2065 inclusive,

consisting of 164, and aggregating in amount $82,200, including two small bonds of $100 each.

"That all of said *data* will more fully appear by reference to said official report of the Treasurer hereto annexed and made a part of (the petition) for greater certainty.

"That the Legislature of the State, by a formal resolution duly passed and signed in accordance with law, ordered said bonds destroyed," but that in fact said bonds were *not* destroyed, and that, on the contrary, said Treasurer "wrongfully and feloniously did convert the same to his own use and embezzled said described bonds."

That the defendant was interested with said Treasurer in his wrongful and illegal conversion of said bonds, and thereby became possessed of same, and pledged, dealt in, and negotiated by sale and exchange the said bonds, "and is the holder of a large quantity of them at this day."

That not only was the defendant a broker and made such negotiations for himself, but he acted and operated through other brokers and the stock exchange, and other agents, in selling and pledging said bonds.

That he formed a copartnership with Alfred Jardet and opened an account with himself in the negotiation of State bonds; and that he carried on a similar business through Lawrence Conroy as his agent—he using the defendant's name in signing notes, checks, etc.

Then the specific averment is made that the defendant did use, pledge and obtain money on said illegal and void bonds to the extent of $110,000, in this, to-wit:

That on the 17th of February, 1882, he pledged to the Germania National Bank $53,000 of said bonds, which he transferred as collateral, on that date, to E. H. Levy and L. Jardet.

That on the 8th of March, 1882, he pledged to the same bank, to secure a loan, $4000 of said bonds, and redeemed the same on May 12, 1882.

That on May 10, 1882, he pledged to same bank $20,000 of said bonds, and redeemed the same on the 18th of that month.

That on July 24, 1882, he pledged to said bank $18,000 of said bonds, and redeemed the same on the 19th of September following.

That on October 10, 1882, he secured a loan of $12,000 from the New Orleans National Bank on a pledge of such bonds, and on the

2d of November of same year he obtained another loan of $5000 on a pledge of such bonds.

The averment is then made "that in all of said transactions said Hart instructed his agents and partners to preserve the identical bonds delivered by him, and to all of which were attached coupons for interest past due and to become due."

That in October, 1883, he borrowed from John Klein & Co. a sum of money and pledged $28,000 of said bonds to secure the loan, and took up same on the 27th of October, 1885.

That from July, 1884, to December 28, 1885, he pledged to Henry Bier $54,200 of said bonds to secure a loan of $30,800, and to all of said bonds were attached interest coupons due from July, 1880, with the exception of bonds numbered 809, 821, 823, 843, 844, 853, 884 and 889, from which said defendant had cut the coupons, up to and including No. 20, due January, 1884.

It is further averred that the defendant, "in pursuance of his agreement and in consideration of his interest in said transactions with said E. A. Burke (treasurer) did compound, by way of account, with said Burke, as to all of said bonds—for it is true that said Burke did have in his possession *coupons of one hundred and five* of said bonds, part of which, *in August, 1881*, he, through his agent, one Cockerton, collected from the State, the State National Bank, all of which will appear in detail as follows, to-wit:

"Bonds numbered 719, 721, 722, 723, 724, 725, 728, 730, 731, 732, 733, 734, 738, 739, 740, 741, 742, 745, 846, 747, 748, 749, 750, 751, 752, 753, 754, 755, 760, 761, 762, 768, 870, 771, 775, 778, 780, 783, 789 and 797—a total of forty (40) coupons, *bearing the number 25.*

"Bonds nnmbered 732, 801, 802, 803, 806, 807, 808, 811, 814, 815, 816, 819, 821, 823, 824, 827, 831, 832, 835, 836, 837, 842, 843, 844, 851, 852, 853, 854, 863, 864, 865, 866, 867, 870, 872, 873, 877, 878, 882, 883, 884, 885, 886, 887, 889, 890, 891, 894, 895, 896, 802, 903, 904"—a total of fifty-three coupons, bearing the number 24.

Bonds numbered 3906, 5606, 5607, 5608, 5609, 5610, 5611, 5612, 5613, 5614, 5789 and 6185, a total of thirteen (13) coupons.

It is then averred "that the above numbers represent a total of 105 consolidated bonds of $1000 each, and are all numbers published as belonging to the Agricultural and Mechanical College bonds, and of bonds exchanged for constitutional bonds and not destroyed."

Besides these there were coupons of the five hundred dollar bonds of the following numbers, to-wit: 2,82, 1627, 1802, 1908, 1910, 1920, 1821, 1822, 1928, 1938, 1847, 1949, 1951, 1952, 1860, 1976, 1078, 1682 193, 194, 2002, 2003, 2005, 2041, 2013, 2018, 2037, 2029, 2032, 2035, 3840, 3041, 3042, 3043, 3047, 3048, 3055, 3056, 3058, 3059, 3060, 3061, 2438, 2440, a total of 44 coupons.

That the total amount represented by coupons is as follows, to-wit:

| | |
|---|---:|
| One coupon No. 24 at $20 | $20 00 |
| 105 coupons No. 25 at $20 | 2,100 00 |
| 44 coupons No. 25 at $10 | 440 00 |
| 2 coupons No. 25 at $2 | 4 00 |
| Total amount | $2,564 00 |

The averment is then made that in February, 1886, the defendant pledged to the Germania National Bank $109,700 of said bonds to secure a loan, and that said bonds remained thus pledged until the 21st of March, 1887; and on the 1st of April, 1887, he pledged to the Mutual National Bank $100,000 of said bonds to secure a loan of $85,000, which was paid on the 1st of November, 1887.

That said negotiations continued, until, in part, the pledging of said bonds was changed, to-wit: "In January, 1888, and from said date, up to September, 1888, when said Hart, through his broker, *sold* $65,000 of said bonds, and the same are now held by various persons in this city; and in addition thereto, the said Hart *has now in his possession* of said bonds" numbers given above and reiterated in the judgment, aggregating $32,500—that is to say, thirteen one thousand dollar bonds, and forty-one five hundred dollar bonds.

Then it is further alleged that the defendant, in addition to the bonds enumerated, viz.: the Agricultural and Seminary bonds, "used as in the manner set forth, by pledging, and did pledge and negotiate by sale and exchange, certain consolidated bonds of the State, and numbered 5606, 5607, 5608, 5609, 5610, 5611 and 5612, each for the sum of $1000; that said bonds were delivered to said E. A. Burke, State Treasurer, whose duty it was to destroy the same; but, unmindful of his duty, he feloniously and corruptly converted same to his own use, and (the defendant) Hart, under his terms of agreement with said Burke, negotiated the same in the manner and form as above set forth."

The charge is then directly made that after December, 1885, and possibly after August, 1886, the defendant "procured to be altered

all of said bonds"—that is to say the consolidated bonds—"and coupons aforesaid, by adding to them the words : 'Interest reduced to two per centum per annum from January first, one thousand eight hundred and eighty, and four per centum per annum thereafter,' purporting and pretending that said bonds were of full force and effect, and valid—making said alteration an essential change, with intent to deceive, and to give to said bonds an apparent validity, and to make them negotiable upon the market, and to collect the interest on said coupons."

It is further averred that Burke, treasurer, did draw, by check, out of the public moneys of the State on deposit with the fiscal agent, the State National Bank, the sum of $30,760, purporting to be in payment of coupons numbered 13, 14, 15, 16, 17 and 18, without specifying the particular bonds either by class or number. "That said checks were drawn to the order of M. J. Hart and Lawrence Conroy, but were all *used* for account of said Hart, and placed to his credit, and by him checked out in payment of his and the said Burke's private or personal matters."

Then follows a list or schedule of said checks, viz.:

"October 17, 1882, to M. J. Hart, for $1040.

"October 17, 1882, to M. J. Hart, for $1040.

"May 23, 1883, to Conroy, for $2500.

"May 23, 1883, to L. Conroy, for $2500.

"May 26, 1883, to M. J. Hart, for $2000.

"May 26, 1883, to M. J. Hart, for $2000.

"September 28, 1883, to L. Conroy, for $2000.

"September 28, 1883, to L. Conroy, for $2000.

"July 3, 1883, to L. Conroy, for $6000.

"July 3, 1883, to L. Conroy, for $2000.

"April 10, 1884, to L. Conroy, for $2720.

"April 15, 1884, to L. Conroy, for $2960."

Then follows the averment that no consideration was given by said Hart for said funds; that said checks were false and fraudulent in their collection and appropriation, and the sums thereof should be refunded to the State.

That Hart well knew he was not entitled to the same, or to collect the same; and that the money was paid in error by the fiscal agent of the State.

In conclusion, the general allegation is made that Hart was possessed of full knowledge of the said transactions, and that in their arrangement and consummation a conspiracy existed between them —Hart and Burke—to defraud the State, and to use for their own personal gain the said securities and moneys, against good conscience and morals, and to the great injury and detriment of the State. Therefore the defendant is indebted to the State for the sums set forth in the sum of $30,760, illegally collected from the State treasury, on the checks of Burke, Treasurer.

But, in order to bring the discussion of the issues of the case within narrower limits, it will be necessary to paraphrase the allegations of the petition; and, by so doing, we find them to be of the following purport, viz.:

*First*—That the Agricultural and Mechanical College, and Seminary bonds were held by the Treasurer in trust, and were actually in his physical custody and possession during the years 1879 to 1888, inclusive, and during which period of time same were by the Constitution declared void, and the General Assembly directed and required to destroy them.

*Second*—That the Treasurer having official custody of said bonds, unlawfully and fraudulently embezzled same, and converted them to his own use; and that the defendant was interested with said Treasurer in the aforesaid illegal conversion of said bonds, and dealt in same by pledge, negotiation, sale and exchange, and is the present holder of a large number of same.

*Third*—That in the course of his negotiations, the defendant, not only personally superintended same as a broker, but acted through other brokers and agents and obtained money on said illegal bonds to the extent of $110,000—enumerating various transactions as having occurred between the dates February 17, 1882, and December, 1885.

*Fourth*—That matured interest coupons were attached to *all* of the aforesaid bonds from date July 1, 1880, with the exception of bonds numbered 809, 821, 823, 843, 844, 853, 884 and 889, "from which the *defendant* had clipped the coupons up to and inclusive of No. 20, due January, 1884."

*Fifth*—That *Burke, Treasurer*, had in his possession coupons of 105 of said bonds, part of which he collected in August, 1881, through

his agent, Cockerton, through the State National Bank—same being the seventy-seven bonds above enumerated.

*Sixth*—That in addition to the foregoing, there were coupons on the forty-four $500 bonds which are enumerated also—being those alleged to be in the possession of Burke.

*Seventh*—That the amount claimed of defendant, on the score of interest thus collected, aggregates $2564.

## I.

First in order comes the check transactions, it being a claim made of the defendant for $30,760, for this, to-wit: that Burke, Treasurer, issued certain checks purporting to have been in payment of interest coupons on consolidated bonds, that were, in fact, never surrendered—that is to say, checks that were issued without consideration, and made payable to the defendant, or to his agent, and in this way same were unduly collected from the fiscal agent of the State in error.

It is alleged that the aggregate amount thus drawn purported to have been in payment of coupons numbered respectively 13, 14, 15, 16, 17 and 18, *though the particular bonds to which said coupons belonged were not enumerated.* But it is alleged that all of the sums collected were received and used by the defendant, being placed to his credit and by him checked out of bank in payment of his and Burke's private or personal matters.

There are twelve checks in number, and they embrace the dates October 17, 1882, and April 15, 1884—four of them, aggregating $6080, being alleged to have been made payable to the order of defendant, and the remaining eight, representing $24,680, alleged to have been made payable to the order of L. Conroy—who was defendant's agent for certain purposes.

The theory upon which the plaintiff proposes to hold the defendant is, that Burke, Treasurer, having official custody of the consolidated bonds, unlawfully and feloniously embezzled same and converted them to his own use; that he issued the aforesaid checks, as in payment of certain interest coupons, which, in point of fact, he did not surrender; and that the defendant, being interested with said Burke in said illegal conversion, and the collection and appropriation of the money collected, for his own and Burke's private account, was responsible therefor.

The judge *a quo* accepted this theory, and charged the jury accordingly, the portion of his charge which is applicable to this question being to the effect that if the jury find from the evidence that the State had paid interest on coupons, then it was their duty " to find from the evidence whether or not the *defendant has received such interest on the checks of the State;* " if so, then it was their duty to find a verdict " for the *amount of interest received by the defendant,* and *for the amount of coupons so collected.".* For the State, under the law, having received no consideration for the money so paid to the defendant, it must be returned by the defendant to the State, same having been paid in error, and the defendant having no legal right to collect or receive the same."

He charged the jury further that if they should " find from the evidence that *defendant did not receive said interest, or any portion thereof,* (their) verdict must be *for the defendant, rejecting the plaintiff's demand for $30,760, the amount of said interest claimed to have been paid on the checks of the State.*"

No objection was urged by plaintiff's counsel to this charge, and we must presume that it was perfectly satisfactory.

We are, therefore, to ascertain whether the defendant was interested with Burke in the aforesaid illicit transactions; or, if he was not, whether he received money from the State, on the payment of coupons, through the medium of the Treasurer's checks unlawfully issued.

Now, while it is true that with reference to the sums that were by Burke checked out of the treasury, there are no particular bonds designated, yet taking the list of checks that is furnished and *their dates,* and it is evident that all the transactions represented by them occurred between the 17th of October, 1882, and April 15, 1884, and during the lifetime of L. Conroy.

Recurring to the dates specified in the petition as those on which the defendant was engaged in bond transactions, and it will be seen that same began on the 14th of February, 1882, by a pledge of $53,000 bonds to the Germania National Bank; and that the subsequent transactions occurred on the 8th of March, 1882; on the 10th of May, 1882; on the 12th of May, 1882; the 24th of July, 1882; on the 19th of September, 1882; on the 10th of October, 1882; on the 2d of November, 1882; on the 10th of July, 1884; on the 27th of October, 1885, and on the 28th of December, 1885. Comparing

dates, and it appears that only one of the transactions which are detailed in the petition is alleged to have taken place within the period when those checks were issued; and the averment of the petition is that the transaction of that date was a loan, which the defendant secured from the New Orleans National Bank, of $5000, on a pledge of $18,000 of bonds, which had been previously pledged to the Germania National Bank, on the 24th of July, 1882, prior to the issuance of the first of said series of checks.

It further appears that the check transactions occurred *antecedent* to the date of defendant's pledge of $54,000 of bonds to Henry Bier, on the 28th of December, 1885, from which it is alleged that the *defendant had cut the coupons* up to and inclusive of coupon No. 20, due January, 1884; and likewise *antecedent* to the date of defendant's pledge to the Germania National Bank, of $109,700 of bonds, in February, 1886; and, also, *antecedent* to his pledge to the Mutual National Bank of $100,000 of bonds on the 1st of April, 1887.

It further appears from the allegations of the petition that in all the various bond transactions of the defendant, prior to the 1st of September, 1888, he acted as *broker* or *agent* in negotiating *pledges* of bonds; and that it was *subsequent* to that date that he acted in the capacity of *owner* of any of said bonds, or made *sales* of them in market.

Hence it is from this standpoint that we are to view the defendant's liability for restitution of interest that is alleged to have been unduly collected from the State.

It is in proof that the defendant was absent habitually during the years 1883 and 1884, in New York, and was only in New Orleans for a few days at a time, and that most of the transactions that occurred in those years were negotiated through L. Conroy.

One witness states that he received two checks of $2000 each, from L. Conroy, on September 29, 1883, and credited same to the account of Hart and Conroy, though the account was, ordinarily, kept in the name of Conroy alone. He says: "I *presumed* it was Hart and Conroy, since Mr. Hart was always telling me that Mr. Conroy was a *partner with him in the city time business.*"

He then makes this explanation, viz.:

"That simply shows that, on September 29, 1883, I received two checks of $2000 each, and they were credited to the account of L.

Conroy.   I can tell no more about it.   I don't know what it was for, or anything; I simply know it is credited to his account."

He further states that on July 3 he finds another entry on his cash book: " L. Conroy, $2000."

That he knows " nothing further than that he received the checks but does not know to whose order the checks were made payable. His books do not show to whom they were drawn, and he knows nothing beyond what his books show."

The defendant, as a witness, states that L. Conroy had charge of *his city time business,* for a portion of the profits during the years 1883 and 1884.

That the money represented by the different checks was paid by Major Burke to Mr. Conroy, for the *accrued interest on his different loans.*

Major Burke informed witness that he had given Mr. Conroy the coupons to cover that, and asked me to give the checks to Conroy. I found afterward that Conroy had drawn a check for a like amount on " May 31, 1883, $4000."   " Mr. Burke," states the witness, "said that he did not like to draw the checks to his own order, being State Treasurer."

" *They were coupons,*" he said, " *he had got from the bonds that he had been carrying* for different parties—I mean to say that *other parties were carrying for him.*"

Q.  " Did Major Burke tell you who held the coupons? "

A.  " He told me that Mr. Conroy held the coupons.   I asked Mr. Conroy about it and he verified the statement."   .

Q.  " Conroy held the coupons and he got the checks? "

A.  " Yes, sir."

Q.  "Are these the only two checks you received in person? "

A.  " That is all."

He says there is no record in his books—those kept by Conroy—of the two checks of September 28, 1883, for $2000 each, ever having been deposited.   Finds no record of check dated July 3, 1883, for $2000, and one for $6000 payable to L. Conroy—no record of these checks having gone into the business.

He then refers to a check for $2960 which was deposited, but it was payable to the order of W. B. Stansberry, and bears date April 16, 1884.   It is evident that this check is not embraced within the calls of the plaintiff's petition, and need not be taken into account in argument.

State vs. Hart.

This witness distinctly and emphatically states that he "never received any coupons, nor delivered any to Major Burke for which he gave a check. Never cut off interest coupons and collected them.'

Under this state of facts—and a critical examination of the entire record shows no other—it is difficult to resist the impression that this demand of the plaintiff's petition is not made out.

The judge *a quo* charged the jury "that the burden of proof is upon the State to prove the allegations contained in her petition," and that " the proof offered must be sufficient to enable them * * * to grant the relief prayed for."

He charged the jury further, that if they should "find from the evidence that L. Conroy was the agent of defendant, or did business for him in his own name, *then the defendant is only bound by the acts of Conroy while acting within the scope and in the course of said business.*"

This is unquestionably the law, and the plaintiff's counsel did not demur to the charge.

It appears evident that whatever agency Conroy had in reference to the checks in question it did not come within the scope of his employment or defendant's responsibility, and consequently he incurred no liability to the State on that score.

There is certainly no evidence to show that the checks were issued in payment of coupons or fraudulent bonds, and particularly in payment of coupons numbered 13, 14, 15, 16, 17 and 18 as charged, though it is clearly shown that they were actually given in payment of coupons, and consequently for a consideration.

## II.

The second demand of the petition is that for $24,300 as the amount of interest that *defendant* is alleged to have *collected*, or which was collected through his *procurement* on illegal bonds.

First enumerating in detail the various bond transactions of the defendant with different persons between the 17th of February, 1882, and December 28, 1885, the petition alleges that "to all of said bonds were attached interest coupons, due from July, 1880, with the exception of bonds numbered 809, 821, 823, 844, 853, 884 and 889, *from which said defendant had cut the coupons up to and including coupon No. 20, due January, 1884.*"

And it further alleges that in pursuance of his "agreement, and in consideration of his interest in said transactions with said Burke, defendant did compound by way of account with said Burke as to all of said bonds, and it is true that said Burke did have in his possession coupons of 105 of said bonds, part of which, in August, 1881, he, through his agent, one Cockerton, collected from the State"—enumerating them by numbers.

There are no other bonds that are indicated by numbers as those from which coupons were clipped by Burke or the defendant and collected from the State, but there are general averments which are sufficiently comprehensive to cover the residue of this particular demand.

We have made a painstaking examination of the record in the vain endeavor to ascertain the proof upon which the jury rested their verdict in favor of the State on this demand.

The proof does not disclose that the defendant personally, or through any agent of his, made any collection of interest coupons while the bonds were in his possession. While the proof does show that the defendant did have many and large transactions in State bonds, aggregating hundreds of thousands of dollars—and many of such dealings with Major Burke—it does not show the number of *illegal* bonds that passed through his hands, and hence it is a matter of impossibility to trace the various coupons on such illegal bonds. State bonds were marketable, and were daily bought and sold on change without suspicion or doubt, and the defendant testifies that he was not aware of any doubt of the legality of the bonds he.dealt in until the bond *exposé* of 1889.

It is evident that the judge *a quo* understood the success of plaintiff's case to depend upon proof of a combination or conspiracy between the defendant and Major Burke, as his charge to the jury on that question will attest, for it says: "If you find from the evidence that Burke, State Treasurer, wrongfully converted said bonds to his own use, *and that the defendant was interested with him in said wrongful and illegal conversion, and assisted said Burke in negotiating said bonds, and in collecting the interest thereon.   *   *   *   And that the State paid interest thereon from January, 1880, to July 1, 1889, then your verdict must be for the plaintiff for $24,300 interest on said bonds,* or whatever portion thereof the evidence before you shows that the State has paid."

And " if you find from the evidence that the *defendant was not interested* with said Burke in said wrongful and illegal conversion, and did not assist Burke, as stated above, *then your verdict must be for the defendant* on the claim *for interest made by the State* for $24,300, on $100,000 State bonds."

This portion of the charge appeared to have been acceptable to the plaintiff's counsel, as he failed to except thereto or reserve objection.

Quite a number of brokers and bank officials were interrogated with regard to the defendant's transactions in State bonds, without any circumstance being elicited *tending* to show the existence of such a conspiracy—though it did elicit the fact that there were many of the illegal bonds that figured in those dealings.

One witness who was on particularly intimate business relations with the defendant speaks of one lot of 180 coupons—detached coupons, which represented $1800—which he is confident of having received from the defendant or some one of his employés or agents. But he afterward qualified this statement by saying that he " could not say that they were all handed to him by Mr. Hart, but there were *some* of them that certainly were." He could not say " that they all were, because there were several different amounts of them."

This, however, the defendant positively denies. The present Treasurer states " that there is in his office no means of telling where any of the illegal payments of interest were made. Nothing to show upon what date any of the illegal payments of interest were made."

The Auditor states that his office had nothing to do with the coupons, and he could not tell whether the Treasurer paid out money in payment of interest coupons prior to 1888 or not.

A confidential agent of Major Burke was interrogated on the part of the State, and while he admitted that he handled a large number of bonds for him—over $200,000—by negotiating and borrowing money on them for Major Burke, and some from the defendant, yet he states nothing tending to show any *conspiracy*, or *interest* in these dealings on the part of the defendant. He says " there were many and large transactions between Major Burke and Mr. Hart, with which he was familiar. These transactions were conducted through Conroy, and checks passed both ways."

A clerk in the office of Major Burke during the time he was Treasurer—a gentleman who was evidently upon close business as well as

friendly relations with him—was interrogated by the State, and he was asked this question:.

Q. "Did you ever have any conversation with Mr. Hart, at any time, in relation to bonds?"

A. "Not in relation to any bonds or coupons, or anything of the kind. I met him occasionally. We have always been friends."

Q. "Did you ever have any conversation with him about the checks?"

A. "No, sir; I never mentioned to him anything in regard to the checks."

This witness states that from 1882 to 1888 he had almost exclusive control of the Treasurer's office, because Major Burke was frequently absent.

After a close investigation of the record, we are unable to agree with the conclusions of the jury on the demand under consideration. There is certainly no evidence of any conspiracy between the defendant and Burke, and there is nothing to show, with any degree of certainty, the amount of interest Burke collected from the State. The State has evidently failed to discharge the burden of proof that the law imposes upon every plaintiff, to make out a claim against the defendant with reasonable certainty. Failing in this she is not entitled to judgment on this score.

### III.

On the last proposition of the plaintiff, that the defendant must surrender the bonds enumerated as being in his possession, there is neither much evidence to consider or argument to make.

Accepting the doctrine that is announced in Pugh vs. Moore, Hyams & Co., 44 An. 209—and to which this court stands thoroughly committed—in reference to the illegality of the consolidated bonds in question, and treating them for the purposes of the argument as absolutely and inherently null and void, on what theory is the defendant to be held to surrender them under a judgment of this court?

The bonds claimed are described in detail by their respective numbers, and the verdict of the jury was in favor of the State commanding the surrender of those described, less certain exceptions already enumerated; and judgment was rendered accordingly—sustaining the writ of sequestration.

State vs. Hart.

The writ of sequestration does not appear in the record, nor the sheriff's return showing his action in the premises, notwithstanding an order was made for the issuance of the writ.

Referring to the defendant's answer we find the following admission, to-wit:

That the defendant was, at the time of the institution of the suit, in possession of twelve bonds of $1000 each, and forty-one of $500 each, aggregating $32,500—of the denomination called consolidated qonds; but said bonds " had, long prior to the institution of this suit, been, by defendant, pledged as security for debt due by him to persons residing outside of the State of Louisiana, who still hold same.''

On this question there is but little testimony other than that of the defendant himself, and the substance of it is as follows:

That he acquired the $32,500 of bonds mentioned from Major Burke as pledges for money loaned on them; but at the time he had no knowledge of their illegality, and no reason to suspect their validity; but that said bonds are not in his possession.

Q. "And you gave the consideration which you have already mentioned to him for them?''

A. "Yes, sir.''

Q. " Burke pledged those bonds to you?''

A. "Yes, sir.''

Q. "And you have held them in pledge since?''

A. "Yes, sir.''

Q. "Before the institution of this suit, what had you done with these bonds Mr. Hart? Where were they at the time this suit was filed—say on the 25th of February, 1890?''

A. " I pledged the bonds, sir.''

Q. " They were in this State, at the time, were they?''

A. " No, sir.''

Q. " Were they here at the time of the *exposé* of Burke, say in September, 1889?''

A. " Yes, sir.''

Q. " How long did they remain here after that?''

A. "Oh! some time.''

Q. " Well, about?''

A. " I think that I had given them to the party about a month previous to this suit, to the best of my recollection.''

Q. "A month previous to the institution of this suit?''

A. " Yes, sir."

On the trial the judge *a quo* charged the jury on this question as follows, viz.:

" If you find from the evidence that Burke pledged to the defendant bonds not belonging to him, and that defendant gave Burke money therefor, and holds said bonds under said pledge, or that the defendant after being informed that said bonds were invalid pledged them to other persons, then I charge you that these facts are no defence to the State's suit for the bonds, and your verdict must be on the bonds for the plaintiff."

This part of the charge does not come within the scope and provisions of the defendant's exception, and consequently it may be considered satisfactory; and, as it is a fact admitted by defendant, that he repledged the bonds to parties residing outside of the State, after it had become known that they were illegal and fraudulent, such pledge is no defence to the action of the State—on the theory of the case of Pugh vs. Moore, Hyams & Co., 44 An. 209, and Herwig vs. Richardson & May, 44 An. 703. See, also, State of Louisiana vs. M. J. Hart, No. 10,652, just decided.

While it is true that these bonds are not actually in possession of the defendant, technically they are—same having been pledged only, and may be recalled at any time the debt is paid.

Under these circumstances this court, in the exercise of its equity powers, may decree the right of the State to have and recover said bonds from the defendant, and to declare them absolutely null and void in his hands, or that of any present or future holder thereof.

On the admissions of the defendant in his answer, the judgment should be so amended as to make it correspond, in respect to the numbers and amounts of the bonds, with the allegations of the petition; and it should be further altered and amended so as to reject and disallow the plaintiff's money demands.

The judge *a quo* charged the jury that they must not entertain, in any manner, defendant's reconventional demand, stating that although it is styled a reconventional demand, it is a claim and suit against the State of Louisiana, and the State can not be sued directly or indirectly in her own courts without legislative permission.

Of a similar reconventional demand we had occasion to express the following opinion in the case of State vs. Hart, No. 10,652, just decided, to-wit:

"In so far as the defendant's reconventional demand is concerned, little need be said, for the reason that it merely alleges the legality and binding force of the bonds in his hands, as obligations of the State. And, inasmuch as, in the course of our opinion on the merits of the principal demand, we were necessitated to pass upon the *primary validity* of the bonds, there is nothing left in the reconventional demand to decide—we therefore pretermit any expression of opinion on the question of law raised with regard to the jurisdiction and authority of this court to render a judgment against the State." To that opinion we adhere.

It is therefore ordered, adjudged and decreed that the judgment appealed from be so amended as to make the numbers, amounts and description of the bonds to be surrendered to correspond with the averments of the petition; and further amended so as to reject and disallow the demand of the plaintiff for the restitution of interest collected; and, as thus amended, the judgment is affirmed with costs of appeal taxed against the plaintiff and appellee.

Mr. Justice Parlange, not being a member of this court at the time of the argument and submission of this cause, takes no part in the decision.

Mr. Justice McEnery, absent (sick).